# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 7, 2022            Decided July 15, 2022

No. 21-3036

UNITED STATES OF AMERICA,
APPELLEE

v.

TAREK ABOU-KHATWA, ALSO KNOWN AS DEAN ADDEM,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cr-00067-1)

———

*William E. Zapf* argued the cause for appellant. With him on the briefs was *Jonathan S. Jeffress*.

*Finnuala K. Tessier*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee. *Jeremy R. Sanders*, Trial Attorney, entered an appearance.

Before: SRINIVASAN, *Chief Judge*, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:   Tarek Abou-Khatwa challenges his convictions for health care fraud, false statements relating to health care matters, mail fraud, wire fraud, and identity theft. Abou-Khatwa connected small businesses and non-profits with health care plans offered by CareFirst Blue Cross Blue Shield ("CareFirst"), a health insurance company.   A jury found that Abou-Khatwa falsified information about those businesses and their employees to artificially lower the health insurance premiums CareFirst charged.   He then directed his clients to pay higher premiums than CareFirst was charging and pocketed the difference.

Abou-Khatwa seeks the dismissal of most of the counts of his indictment and a new trial on the remaining counts.   In his view, the indictment failed to allege a convergence between the deceived entity, CareFirst, and those deprived of property— which, in Abou-Khatwa's view, were his clients.   In other words, he claims that the indictment did not allege that he defrauded CareFirst of any of its own property.   He argues instead that the indictment and trial improperly relied on evidence that he defrauded his small business clients by overcharging them for health insurance premiums.   He also brings a number of evidentiary challenges.

There is no convergence problem in this case.   The indictment alleged that Abou-Khatwa defrauded CareFirst, causing it to lose money.   That is the same fraud that the government proved at trial.   The differential between the falsely lowered premiums that Abou-Khatwa tricked CareFirst into charging and those he billed his clients represented, at least in part, property fraudulently taken from CareFirst.   That price difference also helped to show Abou-Khatwa's profit motive for the fraud, and demonstrated that he was neither acting as a Robin Hood nor at the behest of his clients to help reduce their

premiums.   None of Abou-Khatwa's other challenges on appeal succeed, so we affirm the district court's judgment.

**I**

**A**

Abou-Khatwa was the Chief Executive Officer and founder of a firm named Benefits Consulting Associates. Through that business, he sold CareFirst insurance to a number of small businesses.[1]

Leveraging his knowledge of CareFirst's procedures and requirements, Abou-Khatwa manipulated his clients' information—such as the number of people they employed and individual employees' identities, ages, and occupations—to obtain lower insurance premiums from CareFirst.   Of these factors, age was the single most important factor CareFirst used in setting insurance premiums.   Abou-Khatwa made the average age of employees look lower by altering the birthdates of individual employees, adding fake, younger employees to employee rosters, and falsely listing employees as affiliated with different employers or with shell entities he created so as to alter the age balance of employee groups.   In addition, he misused the names and Social Security numbers of former clients to pad company rosters with seemingly younger members.

Abou-Khatwa also knew that once CareFirst establishes a business's insurance rate, it remains locked-in for the entire

---

[1]   We consider the evidence in the record in the light most favorable to the verdict.  *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982); *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983); *see United States v. Shabban*, 612 F.3d 693, 696 (D.C. Cir. 2010).

year, regardless of the addition or subtraction of any new members. Every subsequent year, CareFirst recalculates the insurance rate during its annual renewal process. Approximately 60–75 days prior to the renewal date, CareFirst reviews the group's current enrollment data and calculates the average age as of that date. The rate is updated for the next annual cycle to reflect the new group size and average age of members.

Aware of CareFirst's practices, Abou-Khatwa amended employee rosters 90 days prior to the insurance renewal date to ensure that CareFirst used the false employee information in setting the next year's premium. Then, after rates were locked in for the year, he would go back and scrub some of the false employee information from the records.

In the process of procuring unwarrantedly low insurance plans for his clients, Abou-Khatwa violated many of CareFirst's specific requirements for the sale of insurance to small companies. For example, CareFirst does not allow employees of multiple small companies to be insured under one group. In addition, CareFirst requires that at least 75% of a company's employees eligible for medical coverage enroll so that there is a mix of "young and healthy" as well as "older and sick people" in the insured group. Trial Tr. 490:18–19 (Oct. 29, 2019), Government's Supplemental Appendix ("GSA") 618. CareFirst informed brokers of these rules for rate-setting, and Abou-Khatwa falsified his way around them.

Abou-Khatwa spelled out his scheme in detailed, handwritten notes found in his home and office. For example, Abou-Khatwa made a note to himself to "[m]ake sure the [employee] census is modified prior to 90 days." Gov't Ex. 23, GSA 1945. The notes also explain that his process during the renewal period included "modify[ing] [dates of birth] [t]o

bring [the] average age below 35[.]" Gov't Ex. 20, GSA 1939. He elaborated in his notes that, during the renewal period, he could also "add[] DUMIES"—dummies—as extra "young members" of a group. Gov't Ex. 29, GSA 1954.

As an "<u>EXAMPLE</u>" of his strategy, Abou-Khatwa's notes explained that if an insurance plan had a January renewal, he had to "[a]dd dummies the first week of Sept[ember,]" and make October 1st the "effective date" of employment for those "dummies[.]" Gov't Ex. 29, GSA 1954 (some emphases omitted). He noted that he should "[k]eep them in the Group [for] []45 days * * * which [would] be till Nov[ember] 15th[.]" Gov't Ex. 29, GSA 1954. On that date, he planned to "terminate them retro (45 days) Sept. 31st effectively creating a <u>WASH</u>[.]" Gov't Ex. 29, GSA 1954. He also kept a "2013 Master Subscriber List" that consisted of tables and documents showing clients' real employers as well as their falsified assignment to the entity used to group them for insurance purposes. Trial Tr. 1014:16 (Nov. 1, 2019), GSA 1142; Gov't Ex. 58, GSA 1961–1975.

By "lower[ing] [the] average age" in that way, Abou-Khatwa's notes documented that he could achieve a "maximum return" on his fraud. Gov't Ex. 22, GSA 1942 (emphases omitted). Abou-Khatwa then turned around and offered his clients higher (but still competitive) rates for their health insurance premiums than CareFirst charged, lining his own pockets with the difference. Over three and a half years, Abou-Khatwa accumulated for himself millions in fraudulently obtained funds.[2]

---

[2] The FBI acquired some of these notes, along with other evidence in the case, by executing a search warrant on Abou-Khatwa's home in an affluent neighborhood of Washington, D.C.

**B**

A federal grand jury indicted Abou-Khatwa on 24 counts, covering health care fraud in violation of 18 U.S.C. § 1347, making false statements related to health care matters in violation of 18 U.S.C. § 1035(a)(2), mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and identity theft in the first degree in violation of 22 D.C. Code §§ 3227.02(1) and 3227.03(a).

The sole health care fraud count—Count 1—charged Abou-Khatwa with "knowingly, willfully, and with intent to defraud, execut[ing] a scheme and artifice: (a) to defraud a health care benefit program, * * * namely CareFirst, * * * and (b) to obtain money from CareFirst by means of materially false and fraudulent pretenses and representations and the concealment of material facts[.]" Joint Appendix ("J.A.") 4. The indictment detailed that Abou-Khatwa "unlawfully enrich[ed] himself by creating fake groups of insured individuals, which included both fictitious names and real people with altered years of birth, to fraudulently obtain lower insurance premium quotes from CareFirst[.]" J.A. 4. "[O]nce the premium rates were set, [Abou-Khatwa] had the

---

One of the FBI agents who executed the search warrant testified that, after knocking on the front door three or more times without answer, "[t]he decision was made, since it was an affluent neighborhood, we knew we had to make a forcible entry at that point, but due to the aesthetics of the neighborhood, we decided to use a rear entrance so as to maintain the integrity of the front of the residence." GSA 438–439. This apparent disparate treatment of wealthy and poorer residents raises serious concerns about the fair and evenhanded administration of justice by the FBI. We appreciate counsel for the government's recognition of the problem and her promise to raise the matter with her superiors.

CareFirst invoices sent directly to him instead of his clients, marked up the insurance premiums charged by CareFirst, and pocketed the difference between the two." J.A. 4. "Through this scheme, [Abou-Khatwa] fraudulently siphoned off in excess of $2 million in illegal proceeds, and diverted the proceeds of the fraud for his personal use and benefit." J.A. 4.

The mail fraud counts—Counts 5 through 12—and wire fraud counts—Counts 13 through 18—each alleged that "Abou-Khatwa[] devised and intended to devise a scheme to defraud CareFirst[.]" J.A. 8–9. Each count is associated with a particular date in 2013 and a specific mailing or wire communication made for the purpose of executing or attempting to execute his scheme.

The counts charging Abou-Khatwa with false statements related to health care matters—Counts 2 through 4—and identity theft—Counts 19 through 24—are tied to particular dates and people or entities whom Abou-Khatwa used as part of his scheme, either by using their name or social security number without permission or by making a false statement about them.

In November 2019, a jury found Abou-Khatwa guilty on all counts.[3] The district court subsequently sentenced Abou-Khatwa to 70 months in prison and 36 months of supervised release. The district court also ordered him to pay $3,836,709.34 in restitution to CareFirst.

---

[3] Following closing arguments, the district court entered a judgment of acquittal on Counts 12 (mail fraud) and 21 (identity theft), so they were not submitted to the jury.

**II**

The district court exercised jurisdiction under 18 U.S.C. § 3231, and this court has appellate jurisdiction under 28 U.S.C. § 1291.

**III**

Abou-Khatwa raises five challenges on appeal. First, he contends that the fraud charges in the indictment should have been dismissed because they failed to conform to the doctrine of convergence. Second, he argues that the district court improperly introduced evidence of uncharged crimes during his trial, namely evidence suggesting that Abou-Khatwa defrauded his own clients. Third, Abou-Khatwa maintains that the district court erred in admitting evidence of conduct that occurred before the statute of limitations period. Fourth, he claims that the government's summary witnesses exceeded the scope of allowable testimony. And fifth, he argues that the cumulative effect of all those errors requires a reversal of his conviction.

Because the law and the record in this case foreclose those objections, we affirm the judgment of the district court.

**A**

Abou-Khatwa argues that the health care fraud, mail fraud, and wire fraud counts in his indictment must be dismissed because they violate the rule of "convergence." Abou-Khatwa Opening Br. 31–33. Convergence is a legal theory that "the party who is deceived must be the same as the party that is defrauded of money or property[.]" *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2013). In Abou-Khatwa's view, the fraud counts of the indictment alleged that while he "defrauded CareFirst by falsely identifying employers,

employees, dates of birth, and ages, the money and property that was alleged to have been obtained by Mr. Abou-Khatwa was that of the *clients*, not CareFirst."   Abou-Khatwa Opening Br. 37.   His argument is narrowly focused on the adequacy of the indictment and does not extend to the sufficiency of proof at trial or the adequacy of jury instructions.   Abou-Khatwa Reply Br. 13; Oral Arg. Tr. 8–9.

Because Abou-Khatwa properly raised this objection to his indictment for mail fraud (specifically Counts 5–7, 9–12) and wire fraud (Counts 13–18) before the district court, we review *de novo* the legal question of whether the indictment sufficiently alleged convergence.   *See United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014).   For the first time, Abou-Khatwa now argues that his indictment for health care fraud (Count 1) and for mail fraud (Count 8) also violate the convergence rule.   We review those challenges for plain error. *See United States v. Walker*, 545 F.3d 1081, 1086–1087 (D.C. Cir. 2008); *see also* Abou-Khatwa Opening Br. 38–39 (conceding Counts 1 and 8 were not challenged in his motion to dismiss).   Under that standard, we reverse only if the defendant establishes that (i) there was an error, (ii) that was plain, (iii) affected Abou-Khatwa's substantial rights, and (iv) "had a serious effect on 'the fairness, integrity or public reputation of judicial proceedings.'"   *Greer v. United States*, 141 S. Ct. 2090, 2096–2097 (2021) (quoting *United States v. Olano*, 507 U.S. 725, 736–737 (1993)); *accord United States v. Bostick*, 791 F.3d 127, 143–144 (D.C. Cir. 2015).

**1**

Other circuits are split on whether the statutes at issue here—18 U.S.C. §§ 1341, 1343, 1347—require convergence. *Compare, e.g.*, *Seidling*, 737 F.3d at 1161 ("[T]his Court does not interpret the mail fraud statute as requiring convergence

between the misrepresentations and the defrauded victims."), *with, e.g.*, *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (interpreting Supreme Court precedent as "ma[king] it clear that the intent must be to obtain money or property from the one who is deceived").[4]  Because the indictment properly alleges convergence, we assume without deciding that these statutes require convergence.

**2**

We agree with the district court that the indictment properly alleged convergence as to the mail fraud counts.

We begin with the plain language of the indictment to ensure "first, [that it] contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007); *accord United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001); *see also id.* ("Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to

---

[4]  *See also United States v. Christopher,* 142 F.3d 46, 54 (1st Cir. 1998) ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived."); *United States v. Pepper,* 51 F.3d 469, 473 (5th Cir. 1995) ("There is no statutory requirement [in 18 U.S.C. § 1341] that direct misrepresentation must be made to the victims of the scheme."); *United States v. Kennedy,* 64 F.3d 1465, 1475–1476 (10th Cir. 1995) (concluding that the "plain language" of 18 U.S.C. § 1341 indicated that "it was 'neither necessary to allege nor prove that false pretenses, representations, or promises were actually made' to anyone, much less to each individual in the distinct mail fraud counts") (citation omitted).

the unique allegations of the indictments returned by the grand jury."). The indictment need only contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1); *see also United States v. Ballestas*, 795 F.3d 138, 148–149 (D.C. Cir. 2015).

The indictment in this case met that standard by adequately alleging that Abou-Khatwa both targeted CareFirst with his fraudulent representations and deprived CareFirst of its property through the fraud.

To start, the indictment's plain terms identify CareFirst as the victim of Abou-Khatwa's mail fraud. It says that Abou-Khatwa "devised and intended to devise a scheme to defraud CareFirst." J.A. 8. The indictment further specifies that Abou-Khatwa aimed "to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, from CareFirst." J.A. 8. The indictment explains that the property Abou-Khatwa obtained was the price difference between the lower "health insurance premiums" that Abou-Khatwa tricked CareFirst into charging and the "higher," roughly market rates that Abou-Khatwa charged his clients. J.A. 8. Without Abou-Khatwa's fraud, CareFirst would have charged and received higher, market rates.

The indictment elaborates that "by creating fake groups of insured individuals, which included both fictitious names and real people with altered years of birth," Abou-Khatwa "fraudulently obtain[ed] lower insurance premium quotes from CareFirst," and "once the premium rates were set, [Abou-Khatwa] had the CareFirst invoices sent directly to him instead of his clients, marked up the insurance premiums charged by CareFirst, and pocketed the difference between the two." J.A. 4. "Through this scheme," the indictment charges, Abou-

Khatwa "fraudulently siphoned off in excess of $2 million in illegal proceeds, and diverted the proceeds of the fraud for" himself.  J.A. 4.

Abou-Khatwa argues that the delta described in the indictment between the premiums fraudulently obtained from CareFirst and the price Abou-Khatwa charged his clients is actually the property of his clients, not CareFirst.  Abou-Khatwa Reply Br. 10.

That is incorrect.  Abou-Khatwa's clients have no legal right to *fraudulently* "lower premium[s] from CareFirst than would have been obtained using accurate information."  J.A. 6.  As a result, some portion of the difference between what Abou-Khatwa paid CareFirst for those premiums and the "marked up" amount he charged his clients belonged to CareFirst, representing the additional amount CareFirst would have charged and received had the premiums been calculated based on accurate data.  J.A. 6.  It is that portion of the delta that constitutes the property of CareFirst and establishes that the indictment sufficiently alleged convergence for all of the mail fraud counts.

**3**

For those same reasons, there is no error in the indictment's allegations of convergence for the wire fraud counts, and certainly no plain error in the indictment's allegations of convergence for the health care fraud count.  The indictment alleges, for all of these counts, the same fraudulent scheme, victim, and property wrongfully taken in the form of the gap between the rates fraudulently charged and what would have been charged and received by CareFirst absent Abou-Khatwa's fraudulent representations.

13

**B**

Abou-Khatwa also objects that the district court permitted the government to introduce evidence of "putative fraud against Mr. Abou-Khatwa's clients," in violation of Federal Rule of Evidence 404(b)'s limitations on the admission of evidence of uncharged wrongful conduct. Abou-Khatwa Opening Br. 40. Abou-Khatwa reasons that he was "effectively tried for two very different fraudulent schemes: one for defrauding CareFirst and the second for defrauding his clients" by "overcharg[ing]" them "when he allegedly 'marked up' the premiums charged by CareFirst[.]" Abou-Khatwa Opening Br. 44, 46. In his view, the government failed to introduce evidence "of any link between the amounts CareFirst *would have charged* but for Mr. Abou-Khatwa's alleged deception, and the amounts Mr. Abou-Khatwa charged his clients." Abou-Khatwa Opening Br. 46.

Abou-Khatwa adds that the district court erred by (i) admitting the evidence because it was more prejudicial than probative, in violation of Federal Rule of Evidence 403, and (ii) refusing to give Abou-Khatwa's proposed jury instruction to limit potential prejudice.

We review the district court's evidentiary decisions for an abuse of discretion. *United States v. Grey*, 891 F.3d 1054, 1060 (D.C. Cir. 2018). None of Abou-Khatwa's objections satisfy that standard.

**1**

Federal Rule of Evidence 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R.

EVID. 404(b)(1). At the same time, the Rule expressly "permit[s]" the admission of such evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b)(2) (formatting modified).

Of course, "[e]vidence that constitutes the very crime being prosecuted[,]" *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000), by definition is not barred by Rule 404(b) because it is not evidence of "any *other* crime," FED. R. EVID. 404(b)(1) (emphasis added). It follows that "[a]cts 'extrinsic' to the crime charged are subject to Rule 404(b)'s limitations; acts 'intrinsic' to the crime are not." *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curiam). And "if the evidence is of an act that is part of the charged offense, it is properly considered intrinsic." *Bowie*, 232 F.3d at 929. "In addition, some uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." *Id.*

The evidence to which Abou-Khatwa objects was both intrinsic to the charged fraud against CareFirst, and admissible for enumerated Rule 404(b) purposes.

Evidence about the difference between the rate CareFirst was misled into charging and the rate Abou-Khatwa charged his clients was intrinsic to the fraud counts themselves because it showed that he executed or attempted to execute a scheme to obtain money or property from CareFirst. Even if the government did not prove the exact amount purloined from CareFirst, the record allowed a reasonable jury to find that some portion of the difference between what CareFirst charged and Abou-Khatwa charged necessarily included property obtained from CareFirst. That is because the existence of that

monetary differential was only possible by falsely obtaining lower premiums from CareFirst through deliberately misleading data—data without which CareFirst would have charged and received higher premiums. The fact that there was a significant divergence—approximately $561,000 in just the last three quarters of 2013—makes it more likely that the inaccurate information Abou-Khatwa fed to CareFirst materially changed the price of its premiums. Client testimony that the rates Abou-Khatwa charged them seemed to be in line with market rates further indicates that the price differential came largely or wholly at the expense of CareFirst.

Importantly, Abou-Khatwa does not contest on appeal the sufficiency of the evidence that his machinations caused CareFirst to charge lower premiums than it otherwise would have. Nor could he have. Testimony given by a CareFirst employee indicated both that "average age [wa]s the most important factor" in determining insurance premiums, and confirmed that there was "a difference or a delta between what * * * would have been the actual rates had CareFirst received accurate information and the rates that were actually obtained in this case." Trial Tr. 503:12, 530:15–18 (Oct. 30, 2019), GSA 631, 658.

While Abou-Khatwa objects that the precise difference in rates charged was never proven, evidence before the jury showed that CareFirst could not calculate the exact differential without untangling all of the individualized misinformation fed by Abou-Khatwa into CareFirst's records. Yet only Abou-Khatwa knew every individual misrepresentation or misgrouping of employees that occurred. As a CareFirst employee testified, "[w]e don't know what the true factual information was," and CareFirst could not recreate that information without undertaking the unwieldy task of "mailing every employer group all the enrollment [information]" for

correction and verification.   Trial Tr. 533:5–7 (Oct. 29, 2019), GSA 661.

Notably, before the jury, the defense argued strenuously that the government's failure to prove precisely what the insurance rates would have been had CareFirst received accurate information was material to whether the government met its burden of proof.   In addition, the defense successfully introduced a jury instruction that specifically advised the jury of the defense's theory "that the difference between the premiums extended to Benefits Consulting Associates' clients and the premiums that would have been extended had CareFirst been given accurate information was not material to CareFirst." Trial Tr. 1701:24–25, 1702:1–2 (Nov. 7, 2019), GSA 1829–1830.

The jury weighed the evidence and rejected Abou-Khatwa's arguments, finding that Abou-Khatwa made "materially false or fraudulent" representations to CareFirst that had the "natural tendency to influence" and were "capable of influencing" CareFirst to materially lower their premiums. Trial Tr. 1707:8–1708:12 (Nov. 7, 2019), GSA 1835–1836.

Beyond all that, even assuming that some portion of that rate delta represents money obtained from Abou-Khatwa's clients in excess of what CareFirst would have charged if given accurate information, his Rule 404(b) claim would still fail. To begin with, that amount would likely still qualify as intrinsic evidence, outside of Rule 404(b)'s scope, because it constitutes "uncharged acts performed contemporaneously with the charged crime," and the very act of charging clients for premiums "facilitate[d] the commission of the charged crime." *Bowie*, 232 F.3d at 929.   The most that the record would show is that Abou-Khatwa's individual acts of charging his clients

higher premiums enabled him to take money from both CareFirst and his clients.

In any event, even if the evidence were extrinsic to the fraud, it would have been properly admitted. Rule 404(b) allows the admission of evidence of other crimes, wrongs, or acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The evidence that Abou-Khatwa charged his clients significantly more than the premiums that CareFirst charged based on false information makes it more likely both that he gave CareFirst false information intentionally, and that he did not make a mistake when submitting incorrect dates of births or falsified employee rosters to CareFirst. The significant gap between CareFirst's lower premiums and Abou-Khatwa's charges to his clients also provides a profit motive for giving CareFirst false information. Plus, the evidence tends "to show the existence of 'a common scheme or plan'" uniting all of the instances of manipulated filings and "'embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other.'" *United States v. Burkley*, 591 F.2d 903, 920 (D.C. Cir. 1978) (citation omitted). Those are all permissible uses of other-acts evidence under Rule 404(b).

So whether the evidence of potential client overcharges is intrinsic or extrinsic to the fraud against CareFirst, the district court properly exercised its discretion to admit the evidence under Rule 404(b).

**2**

Abou-Khatwa's second tack is to argue that admission of evidence that his clients were overcharged violated Federal Rule of Evidence 403. That Rule provides that the district

court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Evidence admissible under Rule 404(b) may still be prohibited under Rule 403's balancing of prejudice and probativeness. *See McGill*, 815 F.3d at 880.

The district court here properly balanced the competing concerns and acted within its discretion in admitting the evidence.

The district court recognized the potentially prejudicial nature of evidence pointing to possible client overcharges. It acknowledged that "the jury is much more likely to be sympathetic to small nonprofits and individuals, and so on, who are paying more for health insurance than they need to— than they are going to be to CareFirst[.]" Pretrial Conference Tr. 43:12–16 (Oct. 15, 2019), J.A. 189. To counter that concern, it barred the government from arguing that Abou-Khatwa "cheated" his clients. Pretrial Conference Tr. 37:25 (Oct. 15, 2019), J.A. 186. At the same time, it allowed the government "to put the facts before the jury that, as part of the scheme" against CareFirst, there was a delta between the lower premiums and client charges. Pretrial Conference Tr. 37:19–21 (Oct. 15, 2019), J.A. 186. As the district court explained "there has to necessarily be a delta" for the scheme to work, and it properly allowed the government to prove "how we got to that delta." Pretrial Conference Tr. 37:19–21 (Oct. 15, 2019), J.A. 186.

By prohibiting the government from arguing that Abou-Khatwa's clients were harmed, the district court struck an appropriate balance between the government's need to prove

the loss to CareFirst against the potential for prejudicial jury sympathy for Abou-Khatwa's clients.

Abou-Khatwa responds by pointing to the personal interests voiced by a juror that led to that juror being excused from the trial. After opening arguments, Juror Number 6 submitted a rather cryptic note to the district court judge saying: "I have CareFirst." Trial Tr. 213:25 (Oct. 28, 2019), J.A. 442. When called to the bench to speak with the trial judge, he explained that "[h]earing the opening statements yesterday, one of my questions in my head was, okay, would my premiums have been less if I had someone—my broker doing this? Would my premiums be less? And there's a question." Trial Tr. 229:4–7 (Oct. 29, 2019), J.A. 443. The district court granted Abou-Khatwa's motion to excuse the individual from the jury. The court explained that the juror had revealed his inability to be impartial because, as a small business owner who used brokers to obtain CareFirst insurance, he was similar to Abou-Khatwa's clients.

Abou-Khatwa posits that the juror's feelings reveal that evidence about the divergence between the CareFirst premiums and the client charges was in fact unduly prejudicial. Not at all. As the district court persuasively explained, Juror Number 6 had unique circumstances that made him unable to be impartial in this case, and he was promptly excused from the jury. The court elaborated that "I think this is simply a situation where the juror was like, oh, brokers, clients, yeah, that's me." Trial Tr. 249:8–9 (Oct. 29, 2019), GSA 377; *see also* GSA 370. Nor did anything in Juror 6's comments indicate a bias against Abou-Khatwa, rather than a desire to obtain available discounts on his own business's health insurance.

Next, Abou-Khatwa argues that "the sheer volume and inflammatory nature of this evidence overwhelmed the evidence of the charged scheme itself." Abou-Khatwa Opening Br. 51. In particular, Abou-Khatwa challenges the "testimony from a multitude of client witnesses[,]" "numerous side-by-side comparisons of what those clients paid compared to what Mr. Abou-Khatwa allegedly paid[,]" and vivid summary charts and testimony of "the percentages by which the premiums were marked up[.]" Abou-Khatwa Opening Br. 51–52.

Yet Abou-Khatwa does not point to any particular client testimony that he or she was defrauded by having to pay higher premiums than CareFirst would have charged if given truthful information. Instead, clients testified that the rates they were charged seemed reasonable and were competitive as compared to other market rates. The client testimony also had critical probative value, providing essential evidence that CareFirst witnesses did not have about the true dates of birth, real names, and work locations of the clients' employees—that is, the working details of the fraudulent scheme.

Abou-Khatwa's challenge to the summary charts and testimony illustrating the delta between what CareFirst charged and what Abou-Khatwa collected overlooks that evidence of some delta had to be introduced to prove that CareFirst was defrauded of its own property. While there no doubt was some repetitiveness in the side-by-side comparisons and percentage mark-up charts, on the whole the district court did not abuse its discretion in finding that the probative value of the evidence outweighed its prejudice.

**3**

Abou-Khatwa next argues that the district court failed to mitigate the prejudice of any client-fraud evidence through jury instructions. Specifically, Abou-Khatwa asked the district court to include, alongside its jury instruction explaining the health care fraud count, language saying: "The alleged victim in Count 1 is CareFirst. Mr. Abou-Khatwa is not charged with defrauding his clients." Trial Tr. 1584:4–5 (Nov. 7, 2019), GSA 1712.

Because Abou-Khatwa's proposal was not framed as an explanation of the elements of the health care fraud count, the district court instead used the following reworded instruction: "[T]o find Mr. Abou-Khatwa guilty of health care fraud, the jury must unanimously find that Mr. Abou-Khatwa engaged in an affirmative act of health care fraud against CareFirst on at least one occasion after March 20, 2013, but before December 31, 2013." Trial Tr. 1707:1–5 (Nov. 7, 2019), GSA 1835.

Abou-Khatwa's challenge boils down to a disagreement over the wording chosen by the district court to tell the jury that it could only convict Abou-Khatwa based on evidence of fraud against CareFirst, rather than fraud against his clients. We review "the choice of language to be used in a particular instruction * * * only for abuse of discretion." *United States v. Vega*, 826 F.3d 514, 524 (D.C. Cir. 2016) (per curiam) (citation omitted).

No such abuse occurred here. The district court's instruction communicated the same concern that Abou-Khatwa wanted to convey—that the only relevant fraud was against CareFirst. In addition, the district court gave another jury instruction requested by Abou-Khatwa that helped clarify this same point: "The defense contends that the difference

between the premiums extended to Benefits Consulting Associates' clients and the premiums that would have been extended had CareFirst been given accurate information was not material to CareFirst. The defense also contends that the government has failed to prove that Mr. Abou-Khatwa willfully engaged in any alleged scheme to defraud CareFirst." Trial Tr. 1701:24–1702:5 (Nov. 7, 2019), GSA 1829–1830.

While the district court did not adopt the exact words advocated by Abou-Khatwa that he was "not charged with defrauding his clients[,]" Trial Tr. 1584:5 (Nov. 7, 2019), GSA 1712, the district court's jury instructions repeatedly focused the jury on the relevant legal question, which was whether Abou-Khatwa defrauded CareFirst.

## C

Abou-Khatwa next challenges the admission of evidence of events that occurred outside of the statute of limitations for the health care fraud count. Specifically, he argues that evidence preceding the limitations period was inadmissible under Federal Rules of Evidence 404(b) and 403. Not so.

By way of background, the indictment charged Count 1 as a single, continuing scheme of health care fraud, 18 U.S.C. § 1347, "[b]eginning in or about 2010, and continuing to in or about 2013[.]" J.A. 4. The district court held, though, that health care fraud is not a continuing offense, and so the five-year general federal statute of limitations applied, *see* 18 U.S.C. § 3282. As a result, the district court considered all evidence prior to March 20, 2013—the date five years before the indictment—to be outside of the statute of limitations. Nevertheless, the district court admitted the evidence as Rule 404(b) evidence and determined that its probative value was

not outweighed by undue prejudice for purposes of Rule 403. The district court acted well within its discretion on both fronts.

**1**

Abou-Khatwa's Rule 404(b) objections take two forms: first as specific challenges to the testimony of two witnesses, and second as a generalized challenge to pre-statute of limitations evidence as a whole.

**a**

As for the witness challenges, Abou-Khatwa objects to the testimony of a former client, Amy Kulp, and a former employee, Fateen Moussa, about events occurring prior to 2013.

Kulp testified that while she was a Benefits Consulting client, she "received a notice from CareFirst directly, wanting [her] to confirm that individuals who were listed as employees were in fact employed by [her] organization." Trial Tr. 607:19–21 (Oct. 30, 2019), GSA 735. She then raised inaccuracies in the employee information given to CareFirst with Abou-Khatwa. She testified that in response to her concerns, Abou-Khatwa "was very upset[,]" "was very stern and angry, and he told me that I should not be having any direct contact with CareFirst." Trial Tr. 614:23–25 (Oct. 30, 2019), GSA 742.

That testimony falls within Rule 404(b)'s compass. Abou-Khatwa's statements and demeanor made it more likely that the inaccuracies in various documents in 2013 were part of a scheme to defraud CareFirst and were intentional fabrications, rather than innocent mistakes. Kulp's testimony

also demonstrated Abou-Khatwa's ability to deceive CareFirst generally without his clients' knowledge.

So too did the testimony of Fateen Moussa, who briefly worked for Abou-Khatwa at Benefits Consulting in 2012. He testified that he received a letter from CareFirst on June 27, 2012, about a compliance investigation. Moussa "immediately" called Abou-Khatwa, who told him not to worry about the letter and to "trash it." Trial Tr. 1117:3–14 (Nov. 4, 2019), GSA 1245. A later email from Abou-Khatwa instructed Moussa to tell CareFirst that his groups were all "self administered." Trial Tr. 1123:17–22 (Nov. 4, 2019), GSA 1251. Two days later, Abou-Khatwa emailed Moussa again commenting that Moussa was "overreacting" because "[y]ou can not apply the same principles that you were taught in financial services to small group health insurance." Trial Tr. 1136:1–5 (Nov. 4, 2019), GSA 1264. That testimony was relevant to Abou-Khatwa's knowledge of the misrepresentations and to his deliberate state of mind when he executed his scheme in 2013.

**b**

As for Abou-Khatwa's global challenge to pre-limitations period evidence, he argues that testimony "prior to the cutoff" had "little or no connection to the period after the [statute of limitations] cutoff." Abou-Khatwa Opening Br. 55. That is incorrect.

To start, client testimony, CareFirst business records, and online records of the history of changes made to employee data on CareFirst's website established a consistent pattern and scheme of manipulating client data in one common direction—making client groups seem younger than they truly were. That Abou-Khatwa, for years, repeatedly used the same individuals

as (in his own words) "dummies" with falsified information to manipulate age and other insurance-relevant criteria was pertinent evidence that the misstatements were not innocent error.

In addition, although Abou-Khatwa challenges pre-2013 evidence that was admitted to prove the health care count (Count 1), he does not challenge the admission of that same evidence to prove Counts 2 through 24. Nor could he, as this court has already held that the government may "rely on proof of scheme activity in an otherwise time-barred period" as long as there was "use of the mails or wires *within* the period[.]" *United States v. Howard*, 350 F.3d 125, 127 (D.C. Cir. 2003).

But Abou-Khatwa fails to identify any pre-2013 evidence that relates solely to the health care count. Neither can we identify any pre-statute of limitations evidence bearing on his health care fraud scheme that was not also relevant to the "scheme to defraud" elements of the wire and mail fraud counts. For example, merely demonstrating to the jury that two clients, Khondker Shamsuzzoha and Rakesh Shah, were listed with false birthdates on an employee census would not itself prove mail or wire fraud. Client testimony was needed to establish that Abou-Khatwa knew their true birthdates and employer on the relevant dates. That evidence was rooted in Abou-Khatwa's conversations and interactions with clients before the statute of limitations period.

Given that the evidence Abou-Khatwa challenges was admissible for Counts 2 through 24, his challenge reduces to one of prejudice. But the district court appropriately mitigated any prejudice with an instruction cautioning the jury that the evidence pertaining to each offense should be considered separately. *See United States v. Gooch*, 665 F.3d 1318, 1336 (D.C. Cir. 2012).

In short, the district court did not abuse its discretion in concluding that the pre-statute of limitations evidence admitted to prove health care fraud was admissible under Rule 404(b) to show intent, knowledge, or absence of mistake. In addition, the same evidence would have been before the jury to establish mail and wire fraud, and the district court gave appropriate jury instructions to channel the jury's consideration of the evidence and to offset any prejudice.

**2**

Abou-Khatwa's Rule 403 challenge meets the same fate. He argues that the district court abused its discretion by allowing "a steady stream of evidence relating to events outside the statute of limitations with no systematic limiting principle" such that the evidence was overly prejudicial. Abou-Khatwa Opening Br. 56. But, as just noted, that evidence was highly probative substantive evidence for the mail and wire fraud counts and spoke directly to Abou-Khatwa's state of mind, plan, and absence of mistake as to the health care fraud count. Nor was the evidence as repetitive as Abou-Khatwa portrays. *See supra* Part III.B.1.

The evidence that was the most cumulative was documentary evidence like invoices, history-of-changes logs of employee information that were edited in the CareFirst system, and summary exhibits. But that evidence demonstrated Abou-Khatwa's intentionality and common scheme of altering employee information over time. The information also was less prejudicial than Abou-Khatwa suggests because it was clearly marked by date, and the summary exhibits in particular were separated between pre- and post-statute of limitations periods.

Beyond that, the district court mitigated any unfair prejudice by specifically instructing the jury that the "evidence of events occurring before March 20, 2013, was admitted for its possible relevance to motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Trial Tr. 1706:22–25 (Nov. 7, 2019), GSA 1834. The district court then reemphasized that to find Abou-Khatwa guilty on the health care fraud count, "the jury must unanimously find that Mr. Abou-Khatwa engaged in an affirmative act of health care fraud against CareFirst on at least one occasion after March 20, 2013, but before December 31, 2013." Trial Tr. 1707:1–5 (Nov. 7, 2019), GSA 1835. In that way, the district court ensured that the jury's verdict rested on evidence of post-2013 health care fraud, separating out the pre-2013 evidence that served as substantive evidence for other counts in the indictment or that could only be considered for a Rule 404(b)(2) purpose.

Abou-Khatwa objects that the jury instruction recited all of the potential uses of Rule 404(b) evidence without differentiating those relevant to the case, making it too broad to constrain the jury. *See* Abou-Khatwa Opening Br. 57–58 (citing *United States v. Merriweather*, 78 F.3d 1070, 1076–1077 (6th Cir. 1996)) (holding that jury instructions listing seven Rule 404(b) purposes, many of which were plainly inapplicable, was error). As Abou-Khatwa failed to raise that objection before the district court, we review only for plain error. *See* Abou-Khatwa Opening Br. 58. We find none.

We agree with Abou-Khatwa that, "[a]s a general rule," a Rule 404(b) jury instruction "should identify * * * the particular purpose for which a jury could permissibly use [specific evidence], rather than providing * * * an undifferentiated laundry list of evidentiary uses that may confuse more than it instructs." *McGill*, 815 F.3d at 889.

But the district court did not commit plain error in reciting all of the Rule 404(b) purposes because they each applied to some portion of the pre-2013 evidence. Tellingly, Abou-Khatwa does not argue that any particular purpose listed was inapplicable.

Instead, Abou-Khatwa's objection is that the district court did not explain "the context in which the[] [various purposes] might be applicable" and so failed to "inform jurors how to properly consider the evidence." Abou-Khatwa Opening Br. 57. But it is the confusion that comes from listing "irrelevant" purposes that "risk[s] confusing the jury[.]" *McGill*, 815 F.3d at 889. There was no basis for such confusion here, and Abou-Khatwa provides no basis for finding plain error in the district court's failure to further elaborate on each purpose.

Abou-Khatwa separately argues that the district court should have instructed the jury about the proper Rule 404(b) uses of pre-statute of limitations evidence at the time the evidence was first admitted during trial. Because Abou-Khatwa failed to request such a limiting instruction below, we again review for plain error, and we again find none.

First, in addition to instructing the jury specifically on the permissible uses of the pre-2013 evidence, the district court explicitly contrasted those uses with the jury's duty to render its verdict on the health care fraud count based on evidence of conduct occurring between March and December 2013. *See* Trial Tr. 1706:22–1707:5 (Nov. 7, 2019), GSA 1834–1835.

Second, to reinforce the distinct evidentiary functions of pre-2013 and 2013 evidence, the timing of particular acts was made clear to the jury throughout the trial. In addition, the district court ordered the government to clearly separate its

documentary evidence into pre- and post-statute of limitations evidence and to mark the dates on such evidence as invoices and bank statements and to arrange them in chronological order.

Third, the defense's opening statement underscored that "[t]he conduct that you're going to evaluate to determine whether or not that man committed health care fraud is in 2013." Trial Tr. 200:21–23 (Oct. 28, 2019), GSA 328.

All told, the district court's careful adherence to Rules 404(b) and 403 in its ruling and the protective measures taken to ensure the jury could properly categorize the evidence in weighing its verdict reveal no reversible error.[5]

**D**

Abou-Khatwa next challenges the summary witness testimony of both Special Agent Nicole Hinson of the Health and Human Services Office of Inspector General and forensic accountant Jill Albee of the Federal Bureau of Investigation.

Federal Rule of Evidence 1006 permits the admission of a "summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." FED. R. EVID. 1006. The voluminous underlying records must themselves be admissible and "must be made reasonably available for inspection and copying[.]" *United States v. Fahnbulleh*, 752 F.3d 470, 479 (D.C. Cir. 2014). As long as the summaries of those

---

[5] Because the district court's decision can be sustained under Rules 404(b) and 403, we need not and do not reach the government's alternative argument that health care fraud under 18 U.S.C. § 1347 is a continuing offense. *See* Gov't Br. 41.

voluminous records are "accurate and nonprejudicial[,]" *id.*, the summaries "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses [or documents] throughout the trial[,]" *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983).

That said, there are strict limits on the role of summary witnesses. The trial court must ensure that the witness does not "usurp the jury's fact-finding function by summarizing or describing not only what is in evidence but also what inferences should be drawn from that evidence." *United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020). We have repeatedly warned that summary witnesses "should not draw controversial inferences or pronounce[] judgment[.]" *United States v. Mitchell*, 816 F.3d 865, 877 (D.C. Cir. 2016) (citation omitted). "Another danger to be guarded against is that the jury will treat summary testimony 'as additional evidence or as corroborative of the truth[,]'" rather than just a compilation of existing evidence into a manageable format. *Cooper*, 949 F.3d at 750 (quoting *Lemire*, 720 F.2d at 1348).

Abou-Khatwa argues that both Hinson's and Albee's testimony exceeded the bounds of proper summary testimony. Because Abou-Khatwa raised those objections at trial, we review the district court's admission of the evidence for an abuse of discretion. *See Lemire*, 720 F.2d at 1348. Applying that standard, we find no error in the Albee testimony. We agree with Abou-Khatwa that the Hinson testimony crossed the line by making impermissible inferences from the documentary evidence. But that error was harmless.

**1**

Testifying toward the end of trial, Agent Albee reviewed bank records, CareFirst invoices, and Benefits Consulting invoices to "determine if there was a difference in the CareFirst-billed amounts and the [Benefits Consulting]-billed amounts to clients." Trial Tr. 1401:8–11 (Nov. 6, 2019), GSA 1529. She prepared charts that addressed two separate time periods: one before the statute of limitations from January 1, 2010, to March 19, 2013, and a second one within the limitations period of March 20, 2013, through December 31, 2013. The summaries also broke out the marked-up prices by client. In addition, by examining bank records, Albee was able to pinpoint certain relevant dates, such as when Abou-Khatwa created a bank account for one of his newer companies, which he later used as a shell company to deceive CareFirst.

Abou-Khatwa argues that Albee's testimony exceeded the scope of proper summary witness testimony because when she "match[ed] the amounts charged by CareFirst with the amounts charged to clients of Benefits Consulting Associates for each beneficiary, while accounting for 'retroactive adjustments,' [she] performed complex analyses and made substantial judgments." Abou-Khatwa Opening Br. 62 (citation omitted).

That argument fails. Comparing one set of invoices to another set of invoices, although demanding attention to detail, requires only basic calculations from information on the face of the compiled records.

Abou-Khatwa also objects to Albee's inferences about "which client employees were allegedly assigned to which groups, whether certain employees were included in plans, and what happened when beneficiaries were removed or added." Abou-Khatwa Opening Br. 62–63. But Albee categorized

client employees based solely on Benefits Consulting's own invoices to its clients. She would then search through the CareFirst invoices to determine if she could find a match. If there was no match between Benefits Consulting and CareFirst invoices, Albee did not include those subscribers in her analysis. Cross-referencing invoices to identify the differences between them simply requires lining up and comparing information already provided in the invoices themselves. No inferences are needed. So too did the "retroactive adjustments" about which Abou-Khatwa complains, Abou-Khatwa Opening Br. 62; *see also* Trial Tr. 1527:16–24 (Nov. 6, 2019), GSA 1655, entail nothing more than properly comparing the CareFirst and Benefits Consulting invoices based on data provided in those records.

Those aspects of Albee's testimony all fall within the permissible bounds of summary testimony. *See United States v. Weaver*, 281 F.3d 228, 231 (D.C. Cir. 2002) (postal auditor's "routine computations and culling through of documents" to estimate the minimum amount of cash received daily and to compare that minimum amount to the close-out logs was permissible summary witness testimony) (citation omitted); *id*. (summary witness's "review of Weaver's tax returns and other financial documents" showing that "his expenditures significantly exceeded his known income in 1994–1996" "simply involved the addition of known sources of income and known expenditures").

For those reasons, Albee's summary exhibits and testimony did not exceed the proper scope of Rule 1006.

**2**

As for Agent Hinson's testimony, a number of Abou-Khatwa's challenges lack merit. But one lands on solid ground.

Hinson created summary exhibits of data derived from voluminous documents: history-of-changes logs, CareFirst invoices, Benefits Consulting invoices, and a couple of miscellaneous documents from CareFirst. Based on those voluminous records, she produced a summary exhibit of "the different organizations that are connected to Tarek Abou-Khatwa" and another of the "[Benefits Consulting] pay stubs that were provided to CareFirst[,] * * * compar[ing] the name on the pay stubs to the employer of the person on the pay stub." Trial Tr. 1506:11–15 (Nov. 6, 2019), GSA 1634. She also created "some date-of-birth changes summary exhibits" and "some dummies summary exhibits[.]" Trial Tr. 1506:16–17 (Nov. 6, 2019), GSA 1634. In addition, she was given a list of names by the prosecutor and was asked "to trace what groups they were placed into throughout the course of their time with [Benefits Consulting]." Trial Tr. 1514:18–21 (Nov. 6, 2019), GSA 1642. Based on this list, she created "a summary that lists a bunch of people and has a timeline of all the different groups that they've been part of[.]" Trial Tr. 1506:17–19 (Nov. 6, 2019), GSA 1634. That compilation of evidence under Rule 1006 was proper because it was gleaned solely by looking at the history-of-changes records and sometimes confirming "a time or a date" on a CareFirst invoice. Trial Tr. 1518:11–13 (Nov. 6, 2019), GSA 1646.

Abou-Khatwa argues that Hinson "essentially served as a stand-in CareFirst witness, * * * explaining what the documents were and the information they contained, what particular fields represented, and how information [was]

recorded and updated." Abou-Khatwa Opening Br. 64. Not so. The inferences drawn were plainly evident from the records that Hinson reviewed. For example, she explained that she knew a change had been made in the CareFirst system because she could see two columns in the history-of-changes document, one that said "old value" and another that said "new value." Trial Tr. 1524:23–1525:1 (Nov. 6, 2019), GSA 1652–1653. In another instance, she explained what the column "retroactive adjustment" meant on a CareFirst invoice, which she could discern "by looking [only] at the invoice[s]." Trial Tr. 1527:16–1528:6 (Nov. 6, 2019), GSA 1655–1656. These basic inferences, resting on knowledge that Hinson gained during the course of her examination of CareFirst records, fall within the heartland of proper summary testimony. *See Weaver*, 281 F.3d at 231.

Abou-Khatwa presses that Hinson testified about her conclusion that certain persons listed in the documents were "dummies" based on inferences she drew from those documents, and those inferences did "not simply 'prov[e] the content' of voluminous documents." Abou-Khatwa Opening Br. 64–65 (citation omitted).

Fair point. Among Hinson's summary exhibits is a series of charts, each of which displays the subscribers associated with a specific entity, identified by name and CareFirst insurance group number. The charts include columns listing the subscriber's name, true employer, original date of birth, new date of birth, and the date that the birthdate was changed. The first two charts have asterisks next to some of the subscribers' names. Hinson testified that these asterisks signified that Abou-Khatwa had used them as "dummies"— that is, fake files. Trial Tr. 1536:15–17 (Nov. 6, 2019), GSA 1664. Previous testimony had explained that the term "dummy" meant a "fake[,]" Trial Tr. 969:22–23 (Nov. 1,

2019), GSA 1097, and that a "dummy" could be created for example by "taking customers from [business] A and customers from B, and putting them in C[,]" Trial Tr. 964:23–25 (Nov. 1, 2019), GSA 1092.

Hinson, though, went beyond summarizing records and instead claimed to be able to identify specific subscribers as dummies. She explained that she made those inferences because "they usually have the middle initial D[,] [t]hey're usually employed for one of the CareFirst groups for less than a month[,] [and] [t]hey very commonly have an address associated with Tarek Abou-Khatwa." Trial Tr. 1537:6–9 (Nov. 6, 2019), GSA 1665.

That testimony went too far. In claiming to identify certain individuals as dummies, Hinson was no longer summarizing the voluminous records reviewed but instead was adding her own inference regarding specific modifications of information by Abou-Khatwa as identifiers of the fake subscribers. *See Mitchell*, 816 F.3d at 877. In other words, she went beyond summarizing and started opining.

Identifying that error does not end our inquiry. We must determine whether the error was harmless. FED. R. CRIM. P. 52(a); *see McGill*, 815 F.3d at 880; *United States v. Clarke*, 24 F.3d 257, 267 (D.C. Cir. 1994). When, as here, the defendant's claim of error is preserved, the government bears the burden of proving that a non-constitutional error did not have a substantial influence on the verdict. *Olano*, 507 U.S. at 734.

The government has met its burden in this case. Hinson's improper identification of "dummy" subscribers was cumulative of ample testimony that Abou-Khatwa used "dummy" subscribers in his fraud scheme to falsely alter

employee ages and other relevant characteristics. Abou-Khatwa's personal notes describing his use of "dummies" were introduced multiple times throughout the trial. Trial Tr. 341:1–25, 344:2–18, 348:15–349:25, 376:3–23 (Oct. 29, 2019); Trial Tr. 467:14–469:25, (Oct. 30, 2019); Trial Tr. 962:3–969:23 (Nov. 1, 2019); Trial Tr. 1247:1–22, 1250:6–23, 1258:3–1259:20 (Nov. 5, 2019), GSA 469, 472, 476–477, 504, 595–597, 1090–1097, 1375, 1378, 1386–1387. Two witnesses that worked for Abou-Khatwa testified to his use of "dummies." Trial Tr. 962:1–969:25 (Nov. 1, 2019); Trial Tr. 1247:1–22, 1250:6–23, 1258:3–1259:20 (Nov. 5, 2019), GSA 1090–1097, 1375, 1378, 1386–1387.

Beyond that, this was not a close case. Extensive evidence—much of which was in Abou-Khatwa's own handwritten records—documented the existence of the scheme and its operation. His fabrication of employees and their data was catalogued at length. Against that backdrop, Hinson's inference that certain individual records identified "dummies" used in the scheme was but a small drop in an ocean of evidence against Abou-Khatwa. It could not have made any meaningful difference in the outcome.

**3**

Abou-Khatwa also takes issue with the court's instruction advising the jury to "treat the testimony [from the summary witnesses] and charts and summaries as you treat any other evidence." Abou-Khatwa Opening Br. 66 (citation omitted). Because Abou-Khatwa did not object to this instruction before the district court, we review only for plain error.

With respect to the summary exhibits, there was nothing wrong with that instruction. Under Rule 1006, the exhibits were substantive evidence and needed no limiting instruction.

*United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008); *Weaver*, 281 F.3d at 233; 2 MCCORMICK ON EVIDENCE § 241 (8th ed. 2020) ("Federal Rule 1006 is clear that summaries admitted under its terms are evidence themselves, substituting for the voluminous documents that are not admitted into evidence. And because such summaries are substantive evidence, no limiting instruction is given to the jury as to its use and it may be taken into the jury room during deliberations.").

But with respect to witness testimony about the summary exhibits, we have a problem. *See Mitchell*, 816 F.3d at 877 n.16 (noting distinction between summary testimony and summary exhibits). To ensure that juries do not treat such testimony as corroborative of the truth of the underlying documents, this circuit requires a limiting instruction advising that the testimony "is only an aid in evaluating evidence." *Lemire*, 720 F.2d at 1348 (citation omitted); *Cooper*, 949 F.3d at 752 (District court's jury instruction properly informed jury that summary witness "testimony was to be used 'only as a matter of convenience.'") (citation omitted).

That means that the district court's instruction to the jury to treat the summary witnesses' testimony as evidence was error. But it was not plain error as it did not "seriously affect[] the fairness, integrity or public reputation of [the] judicial proceedings[.]" *Mitchell*, 816 F.3d at 878 (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). Abou-Khatwa's own notes detailing his scheme, the detailed history-of-changes records, as well as the extensive testimony of clients and employees provided overwhelming evidence of his guilt separate and apart from the summary witnesses.

38

## E

Abou-Khatwa briefly argues that the aggregate number of errors that occurred at his trial, when considered cumulatively, requires reversal. Abou-Khatwa Opening Br. 66–67 (citing *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005)). Given that we have identified only two non-prejudicial errors, the cumulative error doctrine is of no help to Abou-Khatwa.

## IV

For all of those reasons, we affirm Abou-Khatwa's conviction and sentence.

*So ordered.*