# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 28, 2019   Decided February 11, 2020

No. 17-3057

UNITED STATES OF AMERICA,
APPELLEE

v.

TARKARA COOPER AND BRIAN BRYANT,
APPELLANTS

———

Consolidated with 18-3021

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:15-cr-00152-3)
(No. 1:15-cr-00152-5)

———

*Dennis M. Hart*, appointed by the Court, argued the cause
and filed the briefs for appellant Tarkara Cooper.

*Brian J. Young*, appointed by the Court, argued the cause
and filed the briefs for appellant Brian Bryant.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the
cause for appellee. With her on the brief were *Jessie K. Liu*,
U.S. Attorney, and *Elizabeth Trosman* and *John P. Mannarino*,
Assistant U.S. Attorneys.

Before: SRINIVASAN and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Several individuals in the District of Columbia acted together to steal millions of dollars from the Federal Treasury. Their method of operation was this. First beg, steal, purchase or borrow other people's identities including, most importantly, their Social Security numbers. Then file false income tax returns seeking refunds in their names. Keep the refund requests relatively small. List on the tax returns the addresses, not of the purported filers, but of one or another co-conspirator. Then, when the refund checks from the Treasury arrive, compromise bank tellers, negotiate the checks, and deposit the proceeds in the conspirators' personal accounts. This multi-year conspiracy netted a total of nearly $5 million in tax refunds from the Treasury.

Antonio Cooper, a bus driver and the hub in the wheel in this conspiracy, entered a plea of guilty and testified for the prosecution against others, including his niece, Tarkara Cooper. The jury convicted her and Brian Bryant of theft of public money and conspiracy to defraud the United States. *See* 18 U.S.C. §§ 641, 371. The jury also convicted Bryant of aggravated identity theft. *See* 18 U.S.C. § 1028A. The court sentenced Ms. Cooper to 63 month's imprisonment, 36 month's supervised release, and ordered her to pay nearly $2 million in restitution. The court sentenced Bryant to 100 month's imprisonment, 36 month's supervised release, and ordered him to pay some $650,000 in restitution. Both defendants appeal their convictions and their sentences.

The evidence showed that Antonio Cooper gathered names, birth dates and Social Security numbers from friends, family members, strangers, and "wherever [he] could." Using this information, he filed more than a thousand fraudulent federal income tax returns seeking refunds. The typical refund check was between $1,000 and $3,000. To receive the refunds from the Treasury, the fraudulent tax returns listed Mr. Cooper's address or the addresses of other participants in his scheme, one of whom was his niece Tarkara Cooper. More than 450 fraudulent tax returns seeking refunds of more than $1,200,000 listed Ms. Cooper's address. When the refund checks arrived she handed them to her uncle, who paid her $50 to $100 per check. He then deposited the checks in his bank account or the accounts of other co-conspirators. Antonio Cooper also sold some of the checks to others, including Bryant.

For his part, Bryant helped Mr. Cooper cash the refund checks and received half of the face value of those checks in exchange. Brianna Turner, a former Bank of America employee, testified that she helped Bryant deposit some of these checks. She said that Bryant expressed a willingness to compensate her in exchange for violating the Bank's rules on third-party deposits. Bryant paid Turner between $300-$600 per check deposited. He controlled dozens of bank accounts into which refund checks were deposited.

At some point in 2010, Postal Inspector Maria Couvillion opened an investigation after detecting what appeared to be fraudulent tax returns being sent through the mail. Not until six years later did a grand jury return indictments against Antonio Cooper, Tarkara Cooper, Bryant and others. In the interim, the conspirators carried on, filing more fake returns and cashing more refund checks.

**I.**

We take up first the district court's rejection of Tarkara Cooper's pretrial motion to suppress statements she made to federal agents. The evidence at the suppression hearing showed that before dawn on December 1, 2010, twelve law enforcement officers – eleven federal agents and one from the local police – arrived at the door of Cooper's home in a "multi unit residential complex" in the District of Columbia.[1] The officers were there to execute a search warrant. An agent knocked and announced their presence. Cooper opened the door and some of the agents entered. Inside were Cooper's six-to-seven year old daughter and an adult female friend of Cooper's. After being interviewed, the friend left.

About an hour into the search, two agents began interviewing Cooper in her living room. At some point in the questioning, she admitted receiving in the mail at her address one to five refund checks each week, and that her uncle paid her when she turned over the checks to him. She argues here, as she did in the district court, that the government could not introduce these statements at trial because the agents did not first give her *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The district court denied Cooper's motion. The court found that Cooper "was not coerced into answering questions" and that

---

[1] Rule 41 of the Federal Rules of Criminal Procedure establishes two types of search warrants – a daytime warrant and a nighttime warrant. It is difficult to obtain a nighttime warrant (*see* Rule 41(e)(2)(ii)), so investigators usually opt for a daytime warrant. But Rule 41(a)(2)(B) defines "daytime" as "the hours between 6:00 a.m. and 10:00 p.m. according to local time." So-called "daytime" warrants therefore may be executed while it is still dark outside.

she was not in custody within the meaning of *Miranda*. At trial, an agent who interrogated Cooper testified about her statements.

Before a suspect in custody is interrogated, she must be advised of her *Miranda* rights. *See Stansbury v. California*, 511 U.S. 318, 322 (1994). If the interrogating officers do not provide *Miranda* warnings, any statements the suspect makes are generally inadmissible at trial. *Id.* The obligation to apprise the suspect of her rights attaches "only where there has been such a restriction on a person's freedom as to render [her] 'in custody.'" *Id.* (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

A suspect is "in custody" if the circumstances of the questioning "present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). To determine whether such a danger existed, courts first consider whether a reasonable person in the suspect's position would have felt that "she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (internal quotation marks omitted). Relevant factors in this assessment include the location of the questioning, statements made during the interview, the presence of any physical restraints, and whether the interviewee was released once the interrogation ended. *Id.*

Because "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," a finding that a person in the suspect's shoes would not have felt free to leave does not end the inquiry. *Id.* Rather, courts must then ask "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* We review *de novo* the district court's custody determination, and we review the underlying factual findings for clear error. *United States v. Brinson-Scott*, 714 F.3d 616, 621 (D.C. Cir. 2013).

Examination of the evidence before the district court at the suppression hearing and at trial reveals no clearly erroneous factual findings.[2] Instead, the evidence amply supports the conclusion that Cooper was not in custody when she admitted that she was aware of, and participated in, her uncle's fraud.

The agents questioned Cooper in her living room. When an interview takes place in a suspect's home, that circumstance usually weighs against finding the kind of custodial situation that merits a *Miranda* warning. *See, e.g.*, *Beckwith v. United States*, 425 U.S. 341, 342, 347-48 (1976); *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017); 2 Wayne R. LaFave et al., Criminal Procedure § 6.6(e) (4th ed. 2014).

Before the interview began, the agents told Cooper that she was a subject of an investigation and described "the voluntary nature of the interview." They asked her "if she would agree to" answer their questions. She agreed.[3] The evidence shows, in other words, that Cooper's statements were given freely and voluntarily. Such statements "remain a proper element in law enforcement." *Miranda*, 384 U.S. at 478.

In addition, no weapons were brandished and no handcuffs were used. Cooper was "cooperative," and the agents employed

---

[2] Cooper did not renew her suppression motion at trial. While we may therefore consider trial evidence to affirm, but not to reverse, the district court's pretrial ruling on the motion, *see United States v. Hicks*, 978 F.2d 722, 724-25 (D.C. Cir. 1992), the evidence at trial basically duplicated the evidence at the suppression hearing.

[3] The parties did not discuss whether this exchange was a functional equivalent of some of the standard *Miranda* warnings ("you have the right to remain silent" and you have the right "to stop answering at any time"). *See Duckworth v. Egan*, 492 U.S. 195, 202-03 & n.4 (1989).

a "professional and cordial tone." At no point did Cooper ask to end the questioning. And once the interview was over, the agents left without arresting her. Put simply, these facts do not portray an environment presenting a meaningful danger of coercion.

Cooper's argument to the contrary focuses on a fifteen-minute break during the questioning. She needed to take her daughter to school, and so the agents drove them to the school, dropped her daughter off, and returned to the house with Cooper to resume the interview. Cooper alleges that the agents refused to let her leave the house unaccompanied, and that this refusal illustrates the custodial nature of the questioning.

Not so. Cooper offers no evidence that she asked to take her daughter to school alone but was prevented from leaving. For safety reasons, if a person leaves her residence during the execution of a search warrant, she is not typically allowed to return until the search is completed. It is thus as likely as not that the agents gave Cooper a ride so that she could return to her house while the search was ongoing. And while she was in the agents' car, Cooper was not asked any questions.

These circumstances do not amount to custody within the meaning of *Miranda*. Indeed, to hold otherwise would be akin to suggesting that voluntary statements uttered during the execution of a valid search warrant are inadmissible at trial absent the issuance of a *Miranda* warning. The Supreme Court has rejected such an expansive view. *See Andresen v. Maryland*, 427 U.S. 463, 475 (1976). The district court thus correctly concluded that Cooper's statements could be used at trial.

**II.**

Cooper and Bryant also challenge the use of Special Agent LaRose as a summary witness. Before trial, the government asked the court to impose what it called the "Rule on Witnesses." Although the government did not mention it, Rule 615 of the Federal Rules of Evidence governs these sorts of requests. The Rule provides: "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." The "must" command is softened with four exceptions. The government asked the court to make an exception for IRS Special Agent Milne, who was the "lead case agent," and for IRS Special Agent LaRose, because "his testimony will be to summarize the evidence that is admitted and put it in context."[4] The defendants did not object to the request.

Both IRS agents attended the entire trial. Milne sat at counsel table. LaRose sat in the audience. The prosecution apparently decided not to use Milne as a witness. The prosecution called LaRose toward the end of its case-in-chief

---

[4] Rule 615 "does not authorize excluding an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." Fed. R. Evid. 615(b). This exception appears to cover Special Agent Milne. Another exception to Rule 615 allows a witness to attend the trial if the party shows that he is "essential to presenting the party's claim or defense." Fed. R. Evid. 615(c). It may be that the government intended Special Agent LaRose to be covered by this exception. *See United States v. Pulley*, 922 F.2d 1283, 1286 (6th Cir. 1991) ("Where the government wants to have two agent-witnesses in attendance throughout the trial, it is always free to designate one agent as its representative under subpart [b] and try to show under subpart [c] that the presence of the second agent is 'essential' to the presentation of its case."); *United States v. Farnham*, 791 F.2d 331, 335 (4th Cir. 1986).

without attempting to qualify him as an expert witness under Federal Rule of Evidence 702.[5]

LaRose's lengthy testimony on direct examination dealt with extensive and detailed charts listing bank records, tax returns, refund checks, and more connecting the defendants with the tax fraud. He testified, for example, that after December 1, 2010, when the agents searched Cooper's residence, 65 refund checks totaling $151,853.24 were mailed to her home. Of those, 59 checks were negotiated, totaling $141,333.49.

Rule 1006 of the Federal Rules of Evidence permits the use of summary charts "to prove the content of voluminous writings." The records here were indeed voluminous – many millions of dollars in fraudulent refunds, thousands of phony tax returns, hundreds of refund checks sent to many addresses, checks cashed by others, deposits made in multiple accounts by multiple co-conspirators, and more. Little wonder that the charts were admitted without objection.

Cooper and Bryant complain that the district court erred in allowing LaRose to testify about matters other than those contained in the charts. Their complaint greatly exaggerates the record.

---

[5] Federal Rule of Criminal Procedure 16(a)(1)(G) requires, at the defendant's request, that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." *See also* LCvR 16.5(b) (requiring pretrial statements that include "a schedule of witnesses to be called by the party" and that expert witnesses "be designated by an asterisk"). It may be that, because its pretrial materials failed to identify LaRose as an expert, the government believed it would be unable to qualify him as an expert at trial.

A prosecutor's "non-expert summary witness can help the jury organize and evaluate evidence which is factually complex." *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). Putting it in terms of "helping the jury" may suggest that prosecutors call summary witnesses for some neutral, educational trial purpose. That of course is not true. Prosecutors call witnesses, including summary witnesses, to prove their case – to help convince the jury that the defendant is guilty as charged.

It follows that there must be limitations on the sort of "help" a government summary witness may provide. One of the most important is this: the witness may not usurp the jury's fact-finding function by summarizing or describing not only what is in evidence but also what inferences should be drawn from that evidence. *United States v. Hampton*, 718 F.3d 978, 983 (D.C. Cir. 2013). Another danger to be guarded against is that the jury will treat summary testimony "as additional evidence or as corroborative of the truth." *Lemire*, 720 F.3d at 1348. *See also* Lauren Weiser, *Requirements for Admitting Summary Testimony of Government Agents in Federal White Collar Cases*, 36 AM. J. CRIM. L. 179, 181-82 (2009).

LaRose, the defendants claim, crossed these lines. They argue that the government functionally introduced the agent as though he were an expert witness by reviewing at length his training and professional background. LaRose then appeared to present an expert opinion, suggesting that based on his fifteen years of experience as an investigator, it is not uncommon for fraudsters to open and use multiple bank accounts to avoid detection by bank employees. The defendants suggest it is possible that the jury simply relied on LaRose's expertise and experience, rather than its own review of the record, to conclude that the signatures were indeed forged and that the scheme participants used several bank accounts to escape detection.

The defendants also argue that LaRose discussed evidence that was, at the time of his testimony, not yet admitted. He testified before two of the government's witnesses, Chyna Watkins and Vincent Short, took the stand. Watkins was Bryant's girlfriend, and she told the jury that she "gave him access to" her bank account and allowed him to deposit thousands of dollars into it. She later withdrew the money for him in exchange for a series of small payments. Short was one of the scheme's victims. He testified that he lost his identification card, that he did not recognize a tax return filed in his name listing Cooper's address, and that he did not sign a check made payable to Bryant that appeared to contain his signature.

Before Watkins and Short offered this testimony, LaRose stated that Watkins's account was under Bryant's control. He also referred to Short's "purported" signature on the check to Bryant. According to the defendants, by doing so he improperly bolstered the credibility of Watkins's and Short's subsequent testimony.

Cooper and Bryant also take issue with LaRose's count-by-count synthesis of the government's evidence against them. They argue that the government used the agent to present conclusory testimony that effectively served as a second closing argument.

But even if the district court erred in allowing LaRose to stray beyond a narrow summary of the evidence reflected in the charts, Cooper and Bryant have not shown that they were substantially prejudiced by this error. *See United States v. Miller*, 738 F.3d 361, 372 (D.C. Cir. 2013); *Kotteakos v. United States*, 328 U.S. 750, 776 (1946). LaRose's testimony was extensive, consuming 150 pages of transcript. The defendants point to a minuscule portion of what he said. The alleged errors

were, in other words, quite minor. Without LaRose's testimony, the record still contains overwhelming evidence of the defendants' guilt. Any error was thus harmless.

Consider the evidence against Cooper. She confessed that she had an agreement with her uncle to receive payment in exchange for giving him the checks that were mailed to her home. The hundreds of checks mailed to her address amply support the finding that she was a knowing participant in the scheme. Her uncle also testified that he told Cooper the tax checks she was receiving were not "legit." She "knew about everything." In addition, Cooper was identified in video surveillance footage interacting with a bank teller who helped the participants perpetrate the fraud. The strength of this evidence makes it very unlikely that the portion of LaRose's testimony Cooper complains about materially influenced the jury's verdict.

The evidence against Bryant was also compelling. Antonio Cooper testified that Bryant helped him cash the refund checks and received half of the face value of those checks in exchange. Brianna Turner, the former bank teller, admitted that she helped Bryant deposit some of these checks in exchange for compensation.

The government presented evidence of multiple bank accounts controlled by Bryant into which dozens of refund checks were deposited. For example, Bryant deposited 26 refund checks totaling more than $115,000 into a Capital One account in his name between May 2011 and July 2012.

Further minimizing the effect of any possible error was the district court's limiting instruction, which informed the jury that LaRose's summaries "are not in and of themselves proof of the facts," and that his testimony was to be used "only as a matter

of convenience." This instruction, virtually identical to the one issued by the trial court in *Lemire*, helped lower the risk that the jury would take the summary testimony for more than it was worth. *See Lemire*, 720 F.2d at 1348 n.32. Juries "are presumed to follow their instructions," and the record offers no reason to doubt the validity of that presumption here. *Zafiro v. United States*, 506 U.S. 534, 540 (1993) (internal quotation marks omitted).

More still, the defendants had an opportunity to cross-examine LaRose. They did so, eliciting testimony that LaRose is not a hand-writing expert and that he lacked personal knowledge about whether Bryant controlled Watkins's bank account. In sum, Watkins's and Short's testimony, as well as the record evidence, fully corroborated LaRose's summary of the investigation. We therefore find that his testimony did not meaningfully prejudice the defense.

### III.

We have reviewed and reject the defendants' remaining arguments. Cooper moved for a mistrial during the government's rebuttal. She alleged that the prosecutor improperly lumped her together with co-defendants whose participation in the scheme was much more substantial. The district court denied this motion. It did not err by doing so. The prosecutor did not misstate the evidence applicable to Cooper, and the occasional inadvertent references to "these defendants" when discussing acts not attributable to Cooper were quickly remedied. *See United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998).

The defendants also challenge the sentences the district court imposed, suggesting that the loss amounts attributed to Cooper and Bryant were too high. The court attributed a loss to

the Treasury of about $650,000 to Bryant's participation in the scheme, and a loss of around $4.6 million to Cooper's participation. These findings of fact must be upheld unless they are clearly erroneous. *United States v. Day*, 524 F.3d 1361, 1367 (D.C. Cir. 2008). They are not.

The value of the bank accounts reasonably connected to Bryant's participation in the scheme was at least $528,252.94. And the government presented evidence of checks attributable to co-conspirators' home addresses that were not attributed to particular bank accounts. The value of such checks was well over a million dollars, and at least some are reasonably connected to Bryant's role in the fraud.

Similarly, the amount attributed to Cooper—the entire intended loss attributable to her uncle's scheme—was not clearly erroneous. *See United States v. Seiler*, 348 F.3d 265, 268 (D.C. Cir. 2003) (noting that, in determining a sentence in a conspiracy case, the district court takes into account "all reasonably foreseeable acts and omissions" committed by others in furtherance of the conspiracy) (internal quotation marks omitted). Because, as the district court noted, Cooper's participation in the scheme was "neither minor nor minimal," it was not clear error to conclude that her co-conspirators' actions were reasonably foreseeable to her.

Cooper also challenges the restitution the district court ordered her to pay. But the Mandatory Victim Restitution Act requires defendants to reimburse victims for the actual, provable loss suffered. *See United States v. Fair*, 699 F.3d 508, 512-13 (D.C. Cir. 2012). The government showed that Cooper's participation in the scheme cost the Treasury at least $1.9 million. Requiring this amount in restitution was therefore appropriate.

For these reasons, the defendants' convictions and the sentences they received are affirmed.

*So ordered.*