# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 7, 2023        Decided July 23, 2024

No. 22-3015

UNITED STATES OF AMERICA,
APPELLEE

v.

JOSEPH SMITH,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cr-00324-1)

———

*Jonathan Zucker*, appointed by the court, argued the cause and filed the briefs for appellant.

*David B. Goodhand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Chrisellen R. Kolb* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: SRINIVASAN, *Chief Judge*, GARCIA, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

2

SRINIVASAN, *Chief Judge*: Appellant Joseph Smith was convicted of child sexual abuse and other related offenses after sexually abusing his stepdaughter. In this appeal, Smith brings four challenges to his convictions. First, he contends that an underrepresentation of Black residents in his jury pool violated his Sixth Amendment right to a jury drawn from a fair cross-section of the community. Second, he challenges the district court's denial of his motion to suppress evidence discovered on two cell phones and a personal computer. Third, he asserts that the government's case agent should have been excluded from the courtroom. And fourth, he argues that the case agent improperly testified as an expert at trial. We are unpersuaded by any of those arguments and thus affirm Smith's convictions.

I.

A.

In May 2016, Joseph Smith began sexually abusing A.S., his stepdaughter, when she was twelve years old. For eleven months, Smith forced A.S. to receive oral sex from and perform oral sex on him. Smith also sent A.S. sexually explicit text messages and forced her to send nude photos of herself to him. In April 2017, A.S. and her mother reported Smith's abuse to the police.

Police obtained a warrant to search Smith's residence for evidence of A.S.'s allegations. The affidavit supporting the warrant relied on A.S.'s statements describing her text messages with Smith and the photos she had sent him. The affiant, a detective specializing in child sex abuse, additionally averred based on her experience that child sexual abusers often use their cell phones to take and store pictures of victims and then save the pictures to their personal computers. The affiant explained that those images would be "excellent evidence of

someone who is engaged in committing sexual offenses against children." J.A. 65.

As requested in the affidavit, the warrant authorized a search for, and seizure of:

> Cellular phones, computers, digital storage devices, thumb drives, removable electronic devices such as external hard drives, and the extraction of all electronic data stored inside of them to take place at the residence or a police or court facility, mail matter, any material identifying any resident of the house and to take photographs and sketches of the entire premises, and any items or materials relating to the offense of First Degree Child Sexual Abuse.

J.A. 62.

When executing the warrant, the officers seized three tablets, an Xbox, an air mattress, a personal computer, and twelve cell phones. Police discovered substantial amounts of incriminating evidence on the personal computer and two of the cell phones.

## B.

A grand jury indicted Smith on ten counts related to child sexual abuse under federal and D.C. law. Four of Smith's pretrial and trial motions are at issue in this appeal. The district court denied all four motions.

First, Smith moved to dismiss the indictment based on his Sixth Amendment right to a jury drawn from a fair cross-section of the community. He pointed to statistical evidence that Black persons were underrepresented in Washington,

D.C., jury pools relative to the percentage of Black adults in the D.C. population. Smith asserted that the disproportionate impact of the COVID-19 pandemic on racial and ethnic minorities caused the disparity in the jury pool.

Second, Smith moved to suppress the evidence found on the computer and two cell phones. He argued that police had unconstitutionally seized those devices while executing an invalid warrant to search his home, and that any evidence discovered on the devices thus should have been excluded at trial.

Finally, Smith brought two challenges related to the government's case agent, a special agent in the Federal Bureau of Investigation who testified against Smith. Smith first moved to exclude the agent from the courtroom to prevent her from hearing the testimony of other witnesses. Smith also separately objected to a portion of the agent's trial testimony in which she reviewed text message exchanges with A.S. found on Smith's cell phone. The agent explained which messages Smith sent and which he received based on her interpretation of a report from a program called Cellebrite, which is used to extract information from digital devices. Smith moved to strike the agent's testimony as improper expert testimony.

A jury convicted Smith of seven counts of child sexual abuse, as well as one count each of production of child pornography, possession of child pornography, and enticement of a minor. The district court sentenced Smith to two concurrent terms of life imprisonment.

## II.

On appeal, Smith challenges the district court's denial of the four motions described above. We reject each of Smith's challenges.

5

A.

We first consider Smith's Sixth Amendment challenge to the composition of the jury pool. The Sixth Amendment guarantees a criminal defendant the right to a trial "by an impartial jury," U.S. Const. amend. VI, which the Supreme Court has held must be drawn from a "representative cross-section of the community," *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975) (quoting *Williams v. Florida*, 399 U.S. 78, 100 (1970)). Smith claims that his Sixth Amendment fair cross-section right was violated because Black residents were underrepresented in the jury pool from which his jury was drawn.

In order to establish a prima facie violation of his fair cross-section right, Smith must satisfy all three of the prongs set out by the Supreme Court in *Duren v. Missouri*, 439 U.S. 357, 364–66 (1979). He must show: (i) that the group allegedly excluded (here, Black persons) qualifies as a "'distinctive' group in the community"; (ii) that the representation of the group in jury venires "is not fair and reasonable in relation to" the group's representation in the community; and (iii) that the underrepresentation stems from "systematic exclusion of the group in the jury-selection process." *Id.* at 364.

The district court held that Smith established the first *Duren* prong but not the second or third. We affirm based on the third prong: we conclude that Smith cannot show that the jury-selection process systematically excluded Black residents. We therefore have no need to address the second prong or to resolve how to determine the baseline population or measure underrepresentation for purposes of that prong.

To understand why Smith has failed to demonstrate systematic exclusion of Black residents in the jury-selection

process, it is necessary to outline how that process works for the United States District Court for the District of Columbia. The District's Jury Office initially constructs a master jury wheel from lists of people who: are registered to vote in D.C.; hold a D.C. driver's license, D.C. learner's permit, or other valid D.C. identification card; or pay D.C. income taxes. From the master jury wheel, the Office periodically draws sets of potential jurors for two-week windows of trial start dates. Each of those potential jurors receives a summons and juror-qualification questionnaire in the mail. Some share of those potential jurors responds, and the Office does not follow up with (or take any action against) those who do not respond.

Based on the responses to the questionnaires, the Office filters out people who are disqualified or excused from jury service. The remaining group of eligible jurors is called the qualified two-week jury pool. When there is a trial, the Office instructs a portion of the people in the qualified two-week jury pool to appear at the courthouse for jury selection. From that group, a venire of the size requested by the presiding judge is randomly drawn. Voir dire then occurs, yielding a jury of twelve jurors and two alternates.

Smith contends that, around the time of his trial, Black residents responded to the Jury Office's summonses and questionnaires at lower rates than other groups and thus were underrepresented in the qualified two-week jury pools. In his view, because the jury-selection process allows disparate response rates to affect the composition of the qualified two-week jury pools, the process systematically excludes Black jurors. Smith appears to allege both that the COVID-19 pandemic caused the differential response rate and that the fact of the differential response rate alone suffices regardless of the reason.

Either way, Smith cannot demonstrate the existence of systematic exclusion within the meaning of *Duren*'s third prong. As the Supreme Court explained in *Duren*, the cause of underrepresentation is "systematic" when it is "inherent in the particular jury-selection process utilized." *Id.* at 366. Neither of Smith's theories involves systematic exclusion of that kind.

Smith's first theory involves the COVID-19 pandemic, which of course profoundly affected many aspects of day-to-day life. According to Smith, one of those effects bore on the jury-selection process, in that the pandemic depressed response rates among Black residents, giving rise to nonrepresentative jury pools.

Even assuming the pandemic brought about differential response rates, however, that is not "systematic exclusion" under *Duren*. The pandemic was an exogenous shock rather than something "inherent in the . . . jury-selection process." *Id.* Indeed, Smith acknowledges that the jury-selection process "was carefully calibrated to produce a fair cross-section of the community" and that the COVID-era data "does not resemble" the process's intended results. Defendant's Motion to Dismiss the Indictment at 7, *United States v. Smith*, No. 19-cr-00324 (D.D.C. Oct. 18, 2021).

To the extent Smith's challenge encompasses differential response rates more generally, he still has not shown systematic exclusion in the jury-selection process. Smith alleges that Black residents respond to jury summonses at lower rates than other groups. Even if that is so, the resulting underrepresentation is not "due to [Black residents'] systematic exclusion in the jury-selection process." *Duren*, 439 U.S. at 366. It is instead due to the independent choices of potential jurors—here, choices about whether to respond to a jury

summons. Those sorts of autonomous choices are not "inherent in the particular jury-selection process utilized." *Id.*

In *Duren*, by contrast, the Supreme Court found systematic exclusion of women when the jury-selection process offered certain opportunities to claim exemptions from service only to women and presumed that women (but not men) who failed to respond had claimed exemptions. The resulting underrepresentation was "quite obviously due to the *system* by which juries were selected." *Id.* at 367. That is untrue when underrepresentation results from the independent choices of potential jurors rather than from, as in *Duren*, "the operation of [the jury-selection process's] exemption criteria." *Id.*

Smith also asserts that the Jury Office systematically excludes Black jurors because it fails to follow up on nonresponses or enforce summonses against nonrespondents. But Smith does not explain why Black residents respond at lower rates, why subsequent action by the Office would ameliorate (rather than cement) the disparity, or how many additional steps the Office should be required to take to satisfy the Sixth Amendment. Smith, in other words, has provided insufficient evidence that the Office in fact could remedy the disparities in jury representation by following up on nonresponses or that it would be reasonable to require the Office to do so. In those circumstances, we have no basis to impose an obligation on the Office to take further measures that may or may not mitigate differential response rates or to conclude that the Office's failure to take those measures constitutes systematic exclusion.

For those reasons, we affirm the district court's conclusion that Smith has failed to show a violation of his Sixth Amendment fair cross-section right.

9

B.

We next consider Smith's challenge to the warrant authorizing the search of his apartment. The Fourth Amendment provides that a warrant must "particularly describ[e] . . . the persons or things to be seized." U.S. Const. amend. IV. The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987). To that end, a warrant with an "indiscriminate sweep" is "constitutionally intolerable." *Stanford v. Texas*, 379 U.S. 476, 486 (1965).

The warrant in this case authorized police to search for and seize "[c]ellular phones, computers, digital storage devices, thumb drives, removable electronic devices such as external hard drives, and the extraction of all electronic data stored inside of them to take place at the residence or a police or court facility, mail matter, any material identifying any resident of the house and to take photographs and sketches of the entire premises, and any items or materials relating to the offense of First Degree Child Sexual Abuse." J.A. 62. Smith contends that the warrant was unconstitutionally overbroad in violation of the Fourth Amendment's particularity requirement.

Smith relies largely on our decision in *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017). In *Griffith*, we held that a warrant "to search for and seize all electronic devices" (including cellular phones and computers) at a residence was insufficiently particular. *Id.* at 1276–77. The circumstances in *Griffith*, though, differed meaningfully from those here.

In *Griffith*, the warrant affidavit gave no reason to suppose that the suspect owned a cell phone (or other electronic device) at all, and there was also a "limited likelihood that any cell

phone discovered in the apartment would contain incriminating evidence of Griffith's suspected crime." *Id.* at 1272–75. In those circumstances, we held that it was impermissible to issue a warrant granting officers unfettered access to every electronic device in the apartment.

Here, by contrast, police had ample cause to believe that multiple devices containing incriminating evidence would be found in Smith's apartment. Smith's suspected conduct included exchanging sexually abusive text messages and photos with A.S., which undoubtedly involved multiple electronic devices: namely, the cell phones A.S. and Smith used to communicate with each other. *Contra id.* at 1272 (noting that there was "no information about anyone having received a cell phone call or text message from" the suspect). A.S. confirmed as much in her statements to investigators, when she identified multiple phones that she said had been used to carry out the alleged offenses. And the affidavit supporting the warrant incorporated the information provided by A.S. to establish probable cause that Smith's cell phone and A.S.'s cell phone would contain evidence of A.S.'s allegations. Moreover, the affiant relied on her experience investigating child sexual abuse to provide a detailed account of why and how a suspected abuser would use his personal computer and cell phone to perpetrate his offense. *See United States v. Cardoza*, 713 F.3d 656, 661 (D.C. Cir. 2013) (finding probable cause based in part on an affiant's statements drawn from his training and experience).

Given that probable cause already existed for multiple electronic devices in Smith's apartment, police had reason to believe that other devices in the apartment might also contain evidence of the suspected offense. Smith could well have transferred evidence of his conduct onto multiple devices. He might have done so in the normal course of cycling through

devices, or he might have wanted to make backup copies of photos or disperse evidence across multiple devices. Viewed in light of Smith's suspected conduct, the warrant's "sweep" did not "far outstrip[] the police's proffered justification for entering the home." *Griffith*, 867 F.3d at 1276. Rather, the warrant reasonably authorized police to seize a broad set of electronic devices.

Smith, pointing to the fact that A.S. had identified specific phones in her statements to investigators, contends that the warrant should have limited the authorized seizure to those particular phones or that police should have conducted a reasonable investigation into which devices likely contained incriminating evidence. We disagree. A.S. was thirteen years old when she gave her statements to investigators, and she may have been unable to accurately remember and describe which particular devices would be relevant. In addition, she would not have known whether Smith transferred stored photos and other incriminating evidence to other devices. We decline to hold that police officers armed with information that Smith stored evidence of his crimes on phones and personal computers were obligated to strictly conform the parameters of their investigation to the precise information recalled and related by A.S.

In all events, the good-faith exception precludes suppression of the evidence recovered in the search. Under that exception, suppression of evidence is appropriate "only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926 (1984). To justify suppression, the affidavit must be "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923.

The affidavit here does not meet that high bar. The affidavit included A.S.'s detailed descriptions of Smith's sexual abuse, how he used electronic devices to carry out that abuse, and what evidence would likely be found on those devices. The affidavit also contained several paragraphs of information from a detective describing how sex offenders tend to use multiple electronic devices to carry out their crimes. There was thus ample cause for police to believe that multiple electronic devices found in Smith's residence could contain evidence of his suspected abuse. The officers' reliance on the warrant was reasonable.

Smith also argues the warrant was overbroad in that it allegedly did not limit the types of data that could be taken from the seized devices. Without deciding the underlying merits of the claim, we hold that the good-faith exception also precludes that argument. Given the information in the affidavit and the fact that incriminating data was likely to exist in many forms— including text messages, photos, and internet activity—a reasonable officer could have concluded that probable cause existed for the scope of the search.

None of this is to say that the warrant in this case was necessarily a model of particularity. And when officers can draft affidavits with greater particularity, they presumably would do so to avoid a challenge like the one in this case. That challenge fails here because the warrant was constitutionally sufficient.

## C.

Finally, we consider Smith's challenges to the courtroom presence and trial testimony of the government's case agent.

We begin with Smith's challenge to the district court's ruling permitting the case agent to remain in the courtroom

during the trial. Because Smith did not preserve his argument that the district court failed to recognize its own inherent authority to exclude the agent, we review for plain error. A legal error is plain only if it is "clear or obvious, rather than subject to reasonable dispute"; "affected the appellant's substantial rights, which in the ordinary case means . . . that it 'affected the outcome of the district court proceedings'"; and "'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (alteration omitted) (quoting *United States v. Olano*, 507 U.S. 725, 734, 736 (1993)).

The district court did not clearly or obviously err in allowing the agent to remain in the courtroom. The district court relied on Federal Rule of Evidence 615, which generally requires courts to exclude witnesses from the courtroom at a party's request. Fed. R. Evid. 615 (Dec. 1, 2011) (amended Dec. 1, 2023). (Although Rule 615 was recently amended, we interpret the version in effect during Smith's trial.) But the Rule "does not authorize excluding" "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney." *Id.* 615(b) (now located at Rule 615(a)(2)). Accordingly, the government designated the agent as its representative at trial and the court allowed her to remain in the courtroom.

A government case agent fits squarely within the text of Rule 615(b): she is an "officer or employee" of the government, which is "not a natural person." *Id.*; *see* S. Rep. No. 93-1277, at 26 (1974) ("[I]nvestigative agents are within the group specified under the second exception made in the rule . . . ."). Our sister circuits uniformly agree that the government's case agent in a criminal case falls within Rule 615(b)'s exception. *See, e.g.*, *United States v. Dennison*, 73 F.4th 70, 73 (1st Cir. 2023); *United States v. Rivera*, 971 F.2d

876, 889 (2d Cir. 1992); *United States v. Gonzalez*, 918 F.2d 1129, 1137–38 (3d Cir. 1990); *United States v. Parodi*, 703 F.2d 768, 773 (4th Cir. 1983); *United States v. Robles-Pantoja*, 887 F.2d 1250, 1256–57 (5th Cir. 1989); *United States v. Pulley*, 922 F.2d 1283, 1285 (6th Cir. 1991); *United States v. Edwards*, 34 F.4th 570, 585 (7th Cir. 2022); *United States v. Sykes*, 977 F.2d 1242, 1245 (8th Cir. 1992); *United States v. Valencia-Riascos*, 696 F.3d 938, 941 (9th Cir. 2012); *United States v. Avalos*, 506 F.3d 972, 978 (10th Cir. 2007), *vacated on other grounds*, 555 U.S. 1132 (2009); *United States v. Butera*, 677 F.2d 1376, 1380–81 (11th Cir. 1982). And our court has already recognized that Rule 615's exception for designated representatives "appears to cover" the government's case agents. *United States v. Cooper*, 949 F.3d 744, 749 n.4 (D.C. Cir. 2020).

It is true that, while Rule 615(b) "does not authorize excluding" a party's representative, it also does not expressly prohibit courts from excluding the representative. It appears to be an open question in this court whether district courts have discretion to exclude under a source of authority other than Rule 615. *See, e.g.*, *Bradshaw v. Perdue*, 319 F. Supp. 3d 286, 288–89 (D.D.C. 2018) (collecting authorities). Because no binding precedent squarely resolves that question, the district court did not plainly err in allowing the agent to remain in the courtroom. *See United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000).

Smith also objects to a portion of the agent's testimony at trial. In that testimony, the agent interpreted a report from the program Cellebrite to explain an exchange between A.S. and Smith that police had discovered on Smith's cell phone. After a previous expert witness testified that A.S. sent all the messages in the conversation, the agent sought to clarify which text messages were sent to her and which were sent by her.

Smith contends that the agent was not qualified as an expert and improperly gave that testimony based on specialized knowledge.

Because Smith failed to preserve his argument that the government laid an inadequate foundation for the case agent's expertise, we need not address whether the district court erred in allowing the agent's testimony. No such error would have "affected the outcome of the district court proceedings" in light of the overwhelming evidence against Smith. *See Puckett*, 556 U.S. at 135 (quoting *Olano*, 507 U.S. at 734). If Smith had successfully blocked the agent from testifying based on her knowledge of Cellebrite, he would have prevented only an explanation of who sent and received a handful of text messages. In those messages, A.S. and Smith discussed A.S.'s feeling ill, whether she could leave school early, and her journey home. Regardless of that exchange, there was a vast amount of incriminating evidence of Smith's conduct, including sexually explicit text messages and photos exchanged with A.S. What is more, the messages about A.S.'s illness had already been introduced into evidence by the previous expert witness's testimony; the agent simply added an explanation of which messages were sent by A.S. There thus was no plain error in allowing the government's case agent to testify based on her knowledge of Cellebrite.

\* \* \* \* \*

For the foregoing reasons, we affirm Smith's convictions.

*So ordered.*